UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUIS ANTONIO MARTINEZ, SR., *et al.*,

      Plaintiffs,

v.

COUNTY OF WAYNE*, et al*.,

      Defendants.

Case No. 23-cv-11350
Hon. Matthew F. Leitman

_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 19)

This civil action involves disturbing allegations of dereliction of duty by employees of the Wayne County Medical Examiner's Office (the "ME's Office"). According to Plaintiffs, the body of Luis A. Martinez, Jr. ("Martinez") (to whom Plaintiffs are related) arrived at the ME's Office in February 2021 and sat there decomposing for two months because the employees failed to notify them (Plaintiffs) that Martinez had died. Plaintiffs say that the employees of the ME's Office knew both Martinez's identity and the identity of his next of kin, and easily could have informed them of his death, but they failed to do so because they considered themselves too busy. Plaintiffs contend that by the time they finally learned of Martinez's death – from someone outside of the ME's Office – his body had reached an advanced state of decomposition.

1

In this action, Plaintiffs bring claims against employees in the ME's Office and against Wayne County for violations of the Due Process Clause of the Fourteenth Amendment and for violations of Michigan law.  Defendants have filed a motion to dismiss all of Plaintiffs' claims. (*See* Mot., ECF No. 19.)  Having carefully reviewed the motion and response, the Court concludes, like the two other Judges in this District who have reviewed similar due process claims against employees of the ME's Office and Wayne County, that (1) the individual Defendants are entitled to qualified immunity with respect to that claim, and (2) the federal claim against Wayne County fails because Plaintiffs have not plausibly alleged that the County violated federal law. *See Badder v. Schmidt*, 50 F.Supp.3d 902 (E.D. Mich. 2014) and *Majchrzak v. Wayne County*, 2022 WL 20692608 (E.D. Mich. June 14, 2022).  Thus, for the reasons explained below, the Court will **DISMISS** Plaintiffs' federal claims **WITH PREJUDICE** and will **DISMISS** Plaintiffs' claims under Michigan law **WITHOUT PREJUDICE**.

## I

On or about February 3, 2021, Martinez "was transported by ambulance to Henry Ford Hospital after being found in an unconscious state." (Sec. Am. Compl. at ¶ 21, ECF No. 13, PageID.66.)  Later that day, he was pronounced dead. (*See id.* at ¶ 22, PageID.67.)

2

The next day, Martinez's body "was transferred from the hospital" to the ME's Office where Dr. Michael Caplan "performed a postmortem examination of [Martinez's] body." (*Id.* at ¶ 23, PageID.67.)  Shortly thereafter, investigators with the ME's Office began searching for Martinez's identity and his next of kin. (*See id.* at ¶ 24, PageID.67.)  That investigation quickly uncovered Martinez's "full name, date of birth, and two last known addresses." (*Id.* at ¶ 25, PageID.67.)  The investigators also "identified eight (8) family members as [Martinez's] next of kin at that same time." (*Id.*)  But the investigators did not contact those family members to tell them that Martinez "had died or that his body was in the possession of the [ME's Office]." (*Id.* at ¶ 27, PageID.68.)

Around this same time, Martinez's family members – who were unaware that he had died – began working with a social worker in order to "search for [him]." (*Id.* at ¶ 28, PageID.68.)  On April 8, 2021, nearly two months after Martinez's body arrived at the ME's Office, the social worker learned that Martinez had died and that the ME's Office had custody of his body. (*See id.*)  The social worker passed that information on to Martinez's sister, who then went to the ME's Office.  When she arrived, an investigator "would only show [her] photographs of [Martinez's] body [because] by then the body was in an advanced state of decomposition." (*Id.* at ¶ 29, PageID.68.)  A different investigator then told Martinez's sister that nobody had contacted her family to inform them about Martinez's death because the ME's Office

was "backed up and [nobody was able to] get to it until now." (*Id.* at ¶ 30, PageID.68.)

"Defendants finally turned over the body." (Pls.' Resp., ECF No. 23, PageID.211.)  At that point, the "body was subsequently transported to a funeral home, at which time [Martinez] was cremated, without anyone in the family ever being afforded the opportunity to identify his remains or confirm that the body that was cremated was in fact [Martinez]." (Sec. Am. Compl. at ¶ 32, ECF No. 13, PageID.69.)

## II

Plaintiffs – Martinez's father and his four sisters – filed this action on June 6, 2023. (*See* Compl., ECF No. 1; Sec. Am. Compl., ECF No. 13.)  In the Second Amended Complaint, the operative pleading in this case, they bring claims against the following Defendants: Wayne County (the municipal body that operates the ME's Office), Dr. Carl Schmidt (the Chief Medical Examiner in the ME's Office), Dr. Caplan, Dr. Leigh Hlavaty (the Deputy Chief Medical Examiner in the ME's Office), William Kasper (the Chief Investigator in the ME's Office), Dale Collins (an investigator in the ME's Office), Investigator Davis (an investigator in the ME's Office), and Investigator Doe (an unknown investigator in the ME's Office). Plaintiffs bring the following claims against the Defendants:

- "42 U.S.C. § 1983 – Fourteenth Amendment Due Process" against the individual Defendants (Count I);

- "42 U.S.C. § 1983 – *Monell* Claim" against Wayne County (Count II);

- "Claim Pursuant to M.C.L. § 52.205" against all Defendants (Count III)

- "Gross Negligence" against all Defendants (Count IV); and

- "Intentional or Reckless Infliction of Emotional Distress" against all Defendants (Count V).

Plaintiffs seek as relief, among other things, "[g]eneral and compensatory damages for the physical, emotional, and economic injuries suffered by Plaintiffs by reason of Defendants' unlawful and unjustified conduct" and "punitive damages." (Sec. Am. Compl., ECF No. 13, PageID.78-79.)

Defendants moved to dismiss all of Plaintiffs' claims on August 31, 2023. (*See* Mot., ECF No. 19.)  The Court concludes that it may resolve Defendants' motion without a hearing. *See* E.D. Mich. Local Rule 7.1(f)(2).

### III

Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).  "To survive a motion to dismiss" under Rule 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is

facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id*. When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV

### A

The Court begins with Count I of the Second Amended Complaint in which Plaintiffs allege that the individual Defendants deprived them of due process of law in violation of the Fourteenth Amendment. As relevant here, that Amendment prohibits state actors from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

There are two types of due process claims under the Fourteenth Amendment: procedural due process claims and substantive due process claims.  Plaintiffs bring a procedural due process claim.  To prevail on that claim, Plaintiffs must "demonstrate three elements: (1) that [they] had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that [they] were] deprived of that protected interest within the meaning of the due process clause; and (3) that the state did not afford [them] adequate procedural rights before depriving [them] of [their] protected interest." *Wedgewood L.P. I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010).

In Plaintiffs' due process claim, they contend that they had a "a fundamental property interest in [Martinez's] body recognized under State law and protected by the Fourteenth Amendment to the United States Constitution." (Sec. Am. Compl. at ¶ 37, ECF No. 13, PageID.69.)  They contend that the individual Defendants "deprived [them] of their constitutional right to due process when [those Defendants]," among other things, "failed to discharge their duties under state law to notify Plaintiffs of [Martinez's] death and the location of his body, and to prevent" the body from becoming "severely decomposed." (*Id.* at ¶ 38, PageID.70.)

**B**

Defendants have moved to dismiss Plaintiffs' due process claim on several grounds. (*See* Mot. to Dismiss, ECF No. 19, PageID.126-131, 139-141.)  As one of

those grounds, they argue that the individual Defendants are entitled to qualified immunity.  The Court may consider that defense in the context of resolving Defendants' motion under Rule 12(b)(6). *See, e.g., Crawford v. Tilley*, 15 F.4th 752, 762-66 (6th Cir. 2021) (explaining that there is no "special rule or presumption against granting motions to dismiss that applies specifically for qualified immunity" and reversing denial of qualified immunity to defendant who moved to dismiss plaintiff's complaint under Rule 12 on the basis of qualified immunity).  Once the defense of qualified immunity is raised, the "plaintiff bears the burden" of overcoming that defense. *Id.* at 760.

"There are two steps to [a] qualified-immunity inquiry." *Id.* at 762.  One of those steps requires the Court to ask "whether the facts alleged make out a violation of a constitutional right." *Id.* (internal quotation marks and citation omitted).  The other step requires the Court to "ask whether the right at issue was clearly established when the event occurred so that a reasonable officer would have known that his conduct violated it." *Id.* (internal quotation marks and citation omitted).  The Court "may answer these questions in any order." *Id.*

### C

The Court turns first to the "clearly-established" step of the qualified immunity inquiry.  For the reasons explained below, Plaintiffs have failed to carry

their burden at that step.  The Court will therefore dismiss Plaintiffs' due process claim against the individual Defendants.

## 1

The Supreme Court has repeatedly stressed that the "clearly established" standard is a demanding one that is intended to ensure that individual state actors are held liable for alleged constitutional violations only if they had clear notice that their conduct infringed constitutional rights:

> "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. *al–Kidd, supra,* at 741, 131 S.Ct. 2074 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). *In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate."* *al–Kidd, supra,* at 741, 131 S.Ct. 2074. This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
>
> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al–Kidd, supra,* at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. See *Reichle,* 566 U.S., at 666,

132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.,* at 664, 132 S.Ct. 2088 (internal quotation marks omitted).

*The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna,* 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (*per curiam* ). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra,* at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra,* at 641, 107 S.Ct. 3034.

*D.C. v. Wesby*, 583 U.S. 48, 62-64 (2018) (emphasis added).

"The sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013).

**2**

Plaintiffs have not cited a single decision in which any federal court has held that the individual Defendants' alleged conduct here – failing to notify a decedent's family that the decedent had died and allowing the decedent's body to decompose – violates the Constitution.   Moreover, it does not appear that the individual Defendants could have found such a decision if they had done their own independent legal research at the time of Martinez's death.   In fact, if the individual Defendants had attempted to determine whether failing to provide timely notice of a death and allowing a body to decompose violated the Constitution, they would have discovered that:

- The United States Supreme Court had never ruled on a claim arising out of such alleged conduct, much less held that such conduct violated the Constitution.

- The United States Court of Appeals for the Sixth Circuit had never ruled on a claim arising out of such alleged conduct, much less held that such conduct violated the Constitution.   Instead, that court had addressed in published decisions only whether the removal of body parts from a decedent's corpse violated the Due Process Clause.

- The Michigan Supreme Court – whose decisions are relevant because property interests under the Due Process Clause arise out of state law,

*see Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) – had never decided a case involving such alleged conduct, much less held that that conduct violated Michigan law.

The absence of controlling authority addressing the individual Defendants' alleged conduct here strongly suggests that it was not clearly established that such conduct violated the Constitution.  But the lack of such authority does not compel that conclusion because the Supreme Court's "case law does not require a case directly on point for a right to be clearly established." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021).  Instead, as noted above, Plaintiffs must show that "existing precedent … placed the statutory or constitutional question beyond debate." *Id*. Plaintiffs have not made that showing.

**3**

Plaintiffs argue that a line of decisions from the Sixth Circuit, the Michigan Supreme Court, and the Michigan Court of Appeals, along with two Michigan statutes, clearly establish that the individual Defendants violated their (Plaintiffs') due process rights.  Plaintiffs' analysis of the case law and statutes is thoughtful, but the Court respectfully disagrees with their conclusion.  In the sections below, the Court addresses Plaintiffs' authority and explains why the Court believes that it is insufficient to satisfy their burden on the clearly-established prong of the qualified immunity inquiry.

**a**

**i**

Plaintiffs rely primarily on the Sixth Circuit's decision in *Whaley v. County of Tuscola*, 58 F.3d 1111 (6th Cir. 1995).  They insist that *Whaley* "govern[s]" this case and leaves "little doubt" that the individual Defendants violated their due process rights. (Pls.' Resp., ECF No. 23, PageID.190-191.)  Plaintiffs' reliance on *Whaley* is understandable.  That decision admittedly lends support to their argument that the individual Defendants' conduct violated their due process rights.  But *Whaley* does not *clearly establish* that point.

The plaintiffs in *Whaley* alleged that the defendants violated their procedural due process rights under the Fourteenth Amendment when the defendants "removed the corneas and [] eyeballs" of their deceased relatives and "sold them" without permission. *Whaley*, 58 F.3d at 1113.  The district court held that plaintiffs' allegations failed to state a viable due process claim because plaintiffs had no cognizable property interest in the body of their decedent.  The Sixth Circuit disagreed and reversed.

The Sixth Circuit first identified the "interesting question raised" in the case: "what relief the Constitution might provide when a state actor steals the eyes of a dead man." *Id.* at 1112-13.  The court then said that the more specific question to be decided was "whether Michigan law provides the next of kin with a constitutionally

13

protected property interest in a deceased relative's body, including the eyes." *Id.* at 1113.  The court observed that the Michigan Supreme Court had "repeatedly held that the next of kin are entitled to possession of the body as it is when death comes and that it is an actionable wrong for another to interfere with that right by withholding the body or mutilating it in any way." *Id.* at 1115 (internal citations and quotations omitted).  The court then concluded that Michigan law does "provide the next of kin with a legitimate claim of entitlement and thus a property interest in a dead relative's body, including the eyes." *Id.* at 1117.  The court therefore held that "the [decedent's] next of kin [could] bring a constitutional claim under the Due Process Clause" based upon the alleged removal of the decedent's cornea and eyeballs. *Id.*

*Whaley* did not provide the individual Defendants here with clear notice that their conduct violated Plaintiffs' due process rights.  Indeed, the way in which the Sixth Circuit framed the issue for decision – asking what remedies, if any, were available for "steal[ing] the eyes of a dead man" – would have suggested to the individual Defendants that that case was about the removal of organs from corpses, not about delays in notifying the families of decedents.  Moreover, the conduct at issue in *Whaley* – damaging a corpse by removing organs – differs sharply from the individual Defendants' alleged failure to timely notify Plaintiffs here that Martinez had died.  That difference matters because the "intentional mutilation" of the corpse

14

in *Whaley* was an "important" aspect of that decision. *Badder*, 50 F.Supp.3d at 917 (discussing *Whaley*).  In fact, the Sixth Circuit twice highlighted that Michigan law gives a decedent's family the right to "prevent mutilation" of the corpse. *Whaley*, 58 F.3d at 1115-16.  For these reasons, *Whaley* did not clearly establish that the individual Defendants' alleged conduct here – which did not involve any theft or removal or organs nor the intentional mutilation or manipulation of Martinez's corpse – violated Plaintiffs' due process rights. *See Badder*, 50 F.Supp.3d at 911-16 (holding that *Whaley* did not clearly establish that the delayed delivery of a decedent's body in a state of decomposition violated the due process rights of the decedent's family); *Majchrzak*, 2022 WL 20692608, at ** 6-7 (holding, after citing and discussing *Whaley*, that "[t]he timely identification of a decedent, notification to the decedent's family of decedent's death, and delivery to the decedent's family of the decedent's remains have not been authoritatively decided to be constitutionally-protected rights by the United States Supreme Court, the Sixth Circuit, or the Michigan Supreme Court").

## ii

Plaintiffs counter that one key statement in *Whaley* put the individual Defendants on notice that their conduct violated Plaintiffs' due process rights. (*See* Pls.' Resp., ECF No. 23, PageID.191.)  That statement was: "The Supreme Court of Michigan has repeatedly held that the next of kin [are] entitled to possession of the

body as it is when death comes, and that it is an actionable wrong for another to interfere with that right by withholding the body or mutilating it in any way." *Whaley*, 58 F.3d at 1115 (internal quotation marks omitted) (citing *Doxtator v. Chicago & W. Mich. R.R.*, 79 N.W. 922 (Mich. 1899); *Deeg v. City of Detroit*, 76 N.W.2d 16 (Mich. 1956); and *Keyes v. Konkel*, 78 N.W. 649 (Mich. 1899)). Plaintiffs insist that "[t]he qualification 'as it is when death comes' necessarily implies timely delivery, *i.e.*, before the body starts to decompose." (Pls.' Resp., ECF No. 23, PageID.191.)

While Plaintiffs' reading of the phrase "as it is when death comes" is not unreasonable, a careful review of the relevant cases suggests another meaning: that the corpse must be delivered to the next of kin with all of the body parts that were intact at that time of death and without the injury to the corpse caused by an autopsy. Consider the two Michigan Supreme Court decisions cited in *Whaley* that actually use the phrase "as it is when death comes." Those cases involved claims that corpses were returned with body parts and/or organs missing, not claims concerning the timeliness of delivery of the corpse or naturally-occurring decomposition. *See Doxtator* and *Deeg*, *supra*.[1] Moreover, *all* of the cases cited by the Michigan

---

[1] The Sixth Circuit in *Whaley* also cited the Michigan Supreme Court's decision in *Keyes*, *supra*, *see Whaley*, 58 F.3d at 1115, but the decision in *Keyes* does not contain the "as it is when death comes" phrase. Instead, the Michigan Supreme Court in

Supreme Court as support for the "as it is when death comes" proposition involved claims based upon the mutilation of a corpse before its return,[2] not naturally-occurring decomposition as a result of delay in return of a corpse. *See Larson v. Chase*, 50 N.W. 238, 238 (Minn. 1891) (involving an "action for damages for the unlawful mutilation and dissection of the body of plaintiff's deceased husband."); *Foley v. Phelps*, 37 N.Y.S. 471, 471 (App. Div. 1896) (involving a claim based upon the "cutting open and otherwise abusing and maltreating the dead body."); *Burney v. Children's Hosp. in Bos.*, 47 N.E. 401, 402 (Mass. 1897) (describing the right at issue as "the right to what remains when the breath leaves the body, and not merely to such a hacked, hewed, and mutilated corpse as some stranger, an offender against the criminal law, may choose to turn over to an afflicted relative."). And, of course, *Whaley*, itself, involved a claim based upon the mutilation of a corpse. Thus, *Whaley* and *all* of the cases that supply the foundation for the phrase "as it is when death comes" as quoted in *Whaley* involve the failure to return body parts, the removal of organs from a corpse, and/or the intentional mutilation of the corpse by autopsy; *none* involve delay in notice of death and/or in delivery of the corpse. For that reason

---

*Keyes* recognized a relative's "right to have the body delivered to him for burial *without mutilation*." *Keyes*, 78 N.W. at 649 (emphasis added).

[2] The Michigan Supreme Court cited the cases identified in text above in its decision in *Doxtator*. *See Doxtator*, 79 N.W. at 922. In the *Deeg* decision – the second one in which the court used the "as it is when death comes" phrase – the court quoted the portion of *Doxtator* citing the cases identified in text above.

(and contrary to Plaintiffs' contention), the use of the phrase "as it is when death comes" in *Whaley* (and in the decisions cited in *Whaley*) would not necessarily have given the individual Defendants clear notice that their alleged failure to timely deliver Martinez's corpse here was unlawful.

Finally, Plaintiffs suggest that *Whaley* put the individual Defendants on notice that their conduct violated their (Plaintiffs') due process rights because the court in *Whaley* said that "Michigan provides the next of kin with a constitutionally protected property interest in the dead body of a relative." *Whaley*, 58 F.3d at 1116. The Court respectfully disagrees. While that statement from *Whaley* acknowledges that the next of kin have a property interest, it does not suggest that conduct like that alleged here would amount to a *deprivation* of that interest. Thus, the Sixth Circuit's recognition of a property interest, standing alone, was not sufficient to put the individual Defendants on notice that their alleged conduct would amount to a due process violation. *See Wesby*, 583 U.S. at 62-64 (explaining that to constitute clearly established law, a decision must give a state official clear notice that *his conduct* violates a constitutional right under the circumstances at issue).

**b**

Plaintiffs next argue that the three Michigan Supreme Court decisions cited in *Whaley* – *Doxtator*, *Deeg*, and *Keyes* – demonstrate that the individual Defendants' alleged conduct violated their (Plaintiffs') clearly-established constitutional rights.

The Court disagrees.  None of those cases involved conduct that resembles the individual Defendants' alleged conduct here, and thus those cases would not have put the individual Defendants on notice that their acts and omissions violated Plaintiffs' due process rights.

In *Doxtator*, a man named Thomas Doxtator "was working as a switchman" for the Chicago and West Michigan Railway Company. *Doxtator*, 79 N.W. at 923. He was "run over by [several railroad] cars and fatally injured." *Id.*  Before he died, his employer called for an ambulance, Doxtator was transported to a hospital, and doctors amputated his legs in an effort to save his life. *See id.*  The hospital then cremated the legs. *See id.*  After Doxator died from his injuries, his wife sued the railway company.  The court described her claim as follows: "The theory of the plaintiff is that, when the railroad company lifted Doxtator from the ground, it took upon its shoulders a duty, and that duty was to care for him while he should live, and at his death deliver his remains, and the whole of them, over to his wife for burial; that the company did not do this, but, instead, negligently allowed the cremation of the dissevered limbs, and is therefore liable to the widow in damages." *Id.*  The court held that the railway company was entitled to a directed verdict because the evidence did not establish that it had undertaken any duty to ensure the return of the decedent's legs to his family.

In *Deeg*, decedent John Deeg was run over by a city motor bus and killed. *See Deeg,* 76 N.W.2d at 18.  After his death, an autopsy "was conducted, in the course of which certain organs were removed and sent to a laboratory for examination." *Id.* "The laboratory examination resulted in the destruction of [those] organs." *Id.* Deeg's widow then sued "on the ground that the alleged mutilation of the body of John Deeg was done without her consent and in violation of her legal rights with reference to the possession and burial of the body." *Id.*  The Michigan Supreme Court held that the plaintiff had "stated a cause of action" and that the evidence adduced at trial was sufficient to support a verdict in her favor. *Id.* at 19.  The court explained that "[n]o inquest was ordered by proper authority, and it appears from undisputed testimony that defendant's medical representative, present at the autopsy, requested the medical examiner to remove certain organs from the body and that the action was taken pursuant to such request, although the examiner did not deem it necessary. Insofar as defendant's motion for a directed verdict was based on claims that the proofs were insufficient to establish a cause of action on behalf of Mrs. Deeg it was not well-founded." *Id*. at 20.

Finally, in *Keyes*, the defendants, a group of undertakers, took possession of a decedent's body and prepared it for burial.  The defendants then "refused to deliver [the] body" to the decedent's relatives "unless [they] were paid for their services." *Keyes*, 78 N.W. at 649.  The decedent's brother filed "an action of replevin to recover

the dead body." *Id.*  The court held that replevin was not the proper cause of action for return of decedent's body, and it ordered the case dismissed. *See id.*  The court acknowledged that "[i]n certain modern American cases, a dead body has been said to be a quasi property, and the right to control and bury it, and to recover against one who mutilates the corpse, has been maintained." *Id*.  The court explained that "[t]he recovery in such cases is not for the damage to the corpse as property, but damage to the next of kin by infringement of his right to have the body delivered to him for burial without mutilation. In numerous cases equity has taken jurisdiction to prevent interference with the control of the dead body by persons entitled to control it." *Id*.

As the court in *Badder* recognized, the decisions in *Doxtator*, *Deeg*, and *Keyes* "only illustrate the existence of a right to possess the body for burial and prevent its mutilation." *Badder*, 50 F.Supp.3d at 917.[3]  "None of [those] cases address the delivery of a decedent's remains that had decomposed as a result of an allege delay in notifying next of kin of a decedent's death." *Id*.  Because those cases involved very different alleged misconduct, and the analysis of very different legal questions, they did not provide the individual Defendants here with clear notice that their conduct violated Plaintiffs' constitutional rights.

---

[3] The court in *Badder* offered a careful analysis of *Doxtator*, *Deeg*, and *Keyes* at footnote 3 of its Opinion and Order. *See Badder*, 50 F.Supp.3d at 912 n. 3.  That analysis further highlights the important distinctions between those cases and this case.

**c**

Next, Plaintiffs rely on the Michigan Court of Appeals' decision in *Dampier v. Wayne County*, 592 N.W.2d 809 (Mich. App. 1999).  The facts in *Dampier* are somewhat closer to the alleged facts in this action than were the facts in the cases discussed above, and *Dampier* does contain some helpful language for Plaintiffs. But for the reasons explained below, it does not get Plaintiffs over the clearly-established hurdle.

In *Dampier*, a man named William Dampier was transported to Grace Hospital after suffering a heart attack. *See Dampier*, 592 N.W.2d at 812.  Dampier "was pronounced dead shortly after his arrival at the hospital." *Id.*   Dampier's "remains were kept in the care, custody, and control of Grace Hospital, which thereafter entrusted the remains to Wayne County.  Wayne County, in turn, entrusted the remains to Stinson Funeral Home." *Id.*   When Dampier's family viewed his remains at the funeral home, they "made the macabre discovery that the remains had been allowed to decompose to a 'ghastly and grotesque sight.'" *Id.*  Dampier's family then sued Grace Hospital, Wayne County, and the funeral home. *See id.*  Relevant here, Dampier's family brought a claim against Wayne County for violating the "Due Process Clause of the Michigan Constitution." *Id.*   In that claim, they contended that they had "a constitutionally protected property right in William Dampier's body" and "that Wayne County violated that right by allowing the body

to decompose." *Id*. at 816.  Dampier's family also sought leave to amend to bring a claim against Wayne County under the Due Process Clause of the Fourteenth Amendment. *See id.*  Like the claim under the state constitution, that claim would have alleged that the defendants violated plaintiffs' federal due process rights by "mishandling" Dampier's "remains" in such a way as to allow those remains to "decompose." *Id.* at 819.  The state trial court dismissed the claim under the Michigan Constitution and denied Dampier's family leave to bring their proposed federal constitutional claim. *See id.*

On appeal, the Michigan Court of Appeals first addressed the due process claim under the state constitution.  The court surveyed Michigan case law, including the Michigan Supreme Court's decision in *Deeg, supra*, and held that the state due process claim was not viable. *See id*. at 816-17.  The court explained that the "claim fail[ed] because Michigan does not recognize a property right in a dead body.  As plainly stated by this Court, 'there is no property right in the next of kin to a dead body.'" *Id.* at 817 (quoting *Tillman v. Receiving Hosp.*, 360 N.W.2d 275, 276 (Mich. App. 1984)).  The court therefore affirmed the dismissal of plaintiffs' due process claim under the state constitution.

The court then turned to whether plaintiffs should have been allowed to amend their Complaint to add a federal due process claim based upon essentially the same factual allegations.  The court held that plaintiffs should have been permitted to do

so because "federal law would recognize a claim" based on the defendants' alleged conduct. *Id.* at 819.  The court explained that the plaintiffs had sufficiently "alleged an interference with their federal constitutional property right, pursuant to the *Whaley* decisions." *Id*. at 820.

There appear to be problems with the court's analysis and conclusions.  First, the court's holding that plaintiffs stated a viable federal due process claim even though they failed to state a viable state due process claim seems to conflict with the settled rule that the "due process guarantee of the Michigan Constitution is coextensive with its federal counterpart." *Grimes v. Van Hook-Williams*, 839 N.W.2d 237, 242 (Mich. App. 2013).[4]

Second (and much more importantly), the court did not appear to recognize that its conclusion that Michigan law does not recognize the property interest alleged by plaintiffs should have been fatal to the plaintiffs' federal due process claim. Indeed, a viable federal claim for deprivation of property without due process of law in violation of the Fourteenth Amendment requires a showing that the plaintiff had a protected property interest *under state law*. *See Roth,* 408 U.S. at 577.

---

[4] *See also People v. Johnson*, 971 N.W.2d 692, 696 (Mich. App. 2021) (noting that the "due process guarantee of the Michigan Constitution is coextensive with its federal counterpart."); *Cummins v. Robinson Twp.,* 770 N.W.2d 421, 438 (Mich. App. 2009) (same); *English v. Blue Cross Blue Shield of Mich.,* 688 N.W.2d 523, 531 (Mich. App. 2004) (same).

Third, the court's reading of the *Whaley* decisions seems questionable. The court did not appear to recognize that the district court and Sixth Circuit in those decisions looked to state law, not federal law, to determine whether the plaintiffs had a protected property interest. *See Whaley*, 58 F.3d at 1114-16. Simply put, the federal courts in *Whaley* did not conclude, as the court in *Dampier* understood them to say, that there is a "federal" property right related to the handling of a corpse. *Dampier*, 592 N.W.2d at 820.

Given these apparent problems with the court's reasoning and conclusions in *Dampier*, the Court cannot conclude that *Dampier* clearly establishes that Defendants' alleged conduct violated Plaintiffs' federal due process rights. Indeed, because *Dampier* is internally inconsistent and because its analysis of the federal due process issue deviates from the analytical framework established by the Supreme Court, there is substantial reason to question whether *Dampier* clearly establishes anything with respect federal due process claims. *See Badder*, 50.F.Supp.3d at 917 (explaining that, given its internal inconsistencies, *Dampier* "does not aide Plaintiff[s] here in establishing the right [they] claim[] to have been violated was clearly established.").

In any event, even if *Dampier* could be understood as unambiguously holding that a family has a federal due process right to timely notification of a relative's death and prompt return of the corpse, *Dampier* still would not satisfy Plaintiffs'

burden on the clearly-established prong of the qualified immunity analysis because it is only a single decision from a state intermediate court. *See*, *e.g.*, *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 674 (6th Cir. 2020) (explaining that for a legal principle to be "clearly established" for purposes of qualified immunity, "existing precedent—either controlling authority *or a robust consensus of cases of persuasive authority*—must have placed the constitutional question beyond debate") (emphasis added; internal quotation marks and citation omitted).

Finally, the existence of *Dampier* shows, at most, that courts disagree over whether a family has a federal due process right to timely notice of a decedent's death and the prompt return of the decedent's body – with *Dampier* on one side of the debate and *Badder* and *Majchrzak*, discussed in much more detail below, on the other side – and that disagreement within non-controlling authority underscores why the individual Defendants are entitled to qualified immunity: "If judges [] disagree on a constitutional question, it is unfair to subject [state actors] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999).

### d

Finally, Plaintiffs argue that two provisions of a Michigan statute, M.C.L. §§ 52.205(4) and (6), gave the individual Defendants clear notice that their conduct violated Plaintiffs' constitutional rights.  M.C.L. § 52.205(4) provides, in relevant

part, that "the county medical examiner shall ascertain the identity of the decedent and immediately and as compassionately as possible notify the next of kin of the decedent's death and the location of the body." And M.C.L. § 52.205(6) provides, in relevant part, that "the county medical examiner shall promptly deliver or return the body or any portion of the body to relatives or representatives of the decedent after an examination or autopsy is performed under this section." Plaintiffs argue that those state statutory provisions "explicitly articulate the right of next of kin to receive timely notification of their decedent's death and the location of the body, as well as the right to prompt delivery of the body, […] thereby adding to the body of law affirming this right." (Pls.' Resp., ECF No. 23, PageID.191.)

Plaintiffs' reliance on these state statutory provisions is again understandable. The provisions may, indeed, be relevant to the question of qualified immunity. More specifically, the provisions may inform the Court's analysis of the first prong of the qualified immunity analysis, which asks whether a constitutional violation has occurred. As noted above, in order to show that such a violation has occurred, Plaintiffs must "demonstrate," among other things, that they had a "property interest protected by the Due Process Clause of the Fourteenth Amendment," *Wedgewood L.P. I*, 610 F.3d at 349, and, as *Whaley* instructs, this Court must look to Michigan law in order to determine whether Plaintiffs had a protected property interest in Martinez's corpse. The state statutory provisions cited by Plaintiffs do appear to

shed some light on that one state-law-dependent element of Plaintiffs' due process claim.

But the state statutory provisions are not enough to satisfy Plaintiffs' burden on the clearly-established prong of the qualified immunity analysis. The critical question on that prong is whether a defendant had sufficient notice that his conduct violated "clearly established statutory or constitutional right[s] *under federal law*." *Mosier v. Evans*, 90 F.4th 541, 557 (6th Cir. 2024) (emphasis added). And the Court cannot conclude that the state statutory provisions gave the individual Defendants clear notice that their alleged conduct here constituted a violation of the Due Process Clause of the Fourteenth Amendment. Simply put, at the time of Defendants' alleged conduct, no court had "connected the dots" between the state provisions and a federal due process violation. Stated another way, no court had examined the state provisions, determined that they gave rise to a protected property interest under the Due Process Clause, and ruled that a violation of the provisions may amount to a deprivation of property without due process of law in violation of the Fourteenth Amendment. Without such guidance from a court, Defendants could not reasonably have been expected know that their alleged violation of the *state* provisions would constitute a *federal* due process violation. Instead, Defendants reasonably could have relied upon the "well-settled" understanding "that state law does not ordinarily define the parameters of due process for Fourteenth Amendment purposes, and that

state law, by itself, cannot be the basis for a federal constitutional violation." *Smith v. City of Salem, Ohio,* 378 F.3d 566, 578 (6th Cir. 2004). *See also Hope v. Mullins*, 2014 WL 7139715, at *9 (W.D. Tenn. Dec. 15, 2014) (holding that defendants were entitled to qualified immunity on procedural due process claim where plaintiffs showed only that defendants' alleged conduct violated state law).

The case for qualified immunity here is even stronger because the only three judicial decisions that have addressed procedural due process claims based upon these state statutory provisions (and a prior version of the provisions) have all held that the provisions did *not* give rise to a protected property interest under the Due Process Clause. *See Badder*, 50 F.Supp.3d at 915-16 (holding that M.C.L. § 52.205(4) should not be construed as creating a property interest of constitutional dimension); *Majchrzak*, 2022 WL 20692608, at ** 3-6 (acknowledging M.C.L. § 52.205(4) and M.C.L. § 52.205(6) and rejecting argument that those provisions established a "constitutional right to timely notification of the decedent's death or return of the decedent's remains"); *Montgomery v. County of Clinton*, 940 F.2d 661, 1991 WL 153071 (6th Cir. 1991) (TABLE) (holding that a predecessor version of M.C.L. § 52.205(4) did not create a property interest protected by the Due Process Clause). The fact that multiple federal judges have *rejected* due process claims based upon alleged violations of the state provisions suggests that it would not have been obvious to Defendants that a violation of the provisions was tantamount to a

federal due process violation.  Plaintiffs' invocation of the state statutory provisions

therefore does not overcome Defendants' qualified immunity defense.[5]

## 4

For all of the reasons explained above, the Court concludes that Plaintiffs have

failed to show that the individual Defendants' alleged conduct violated their clearly-

established due process rights.  The District Judges in *Badder* and *Majchrzak*

similarly concluded that family members did not have a clearly-established due

process right to timely notification of a decedent's death and timely return of the

corpse.  The Court finds those decisions to be correctly-decided and worthy of

discussion.

In *Badder*, *supra*, a woman named Kelly Phillips "was found in a home in

Detroit dead of a drug overdose." *Badder*, 50 F.Supp.3d at 905.  Investigators with

the ME's Office then sought to identify and find Phillips' next of kin.  An initial

search of Phillips' wallet did not turn up any useable information, and the available

leads quickly ran dry.  Several weeks later, an investigator took a second look at

---

[5] In sections (IV)(C)(3)(a) through (IV)(C)(3)(d) above, the Court has individually analyzed the cases and statutes cited by Plaintiffs and has determined that none of the cases or statutes clearly establishes that the individual Defendants' alleged conduct violated Plaintiffs' constitutional rights.  The result is the same when the Court considers the authority cited by Plaintiffs collectively.   Stated another way, what Plaintiffs refer to as "the body of law" they have cited (*see* Pls.' Resp., ECF No. 23, PageID.191) does not clearly establish that they had a right under the Due Process Clause of the Fourteenth Amendment to timely notification of Martinez's death and/or to timely return of his corpse.

Phillips' wallet and found a folded piece of paper with two phone numbers on it. *See id.* at 906.  One of the phone numbers was for Phillips' mother.  The investigator contacted Phillips' mother, and her mother then claimed Phillips' body.  Phillips' mother said that "her daughter's body was decomposed to such an extent that she was forced to cremate her [daughter] instead of having a natural burial, which is what she would have preferred." *Id.* at 907.

Phillips' mother then sued Wayne County and several employees of the ME's Office.  In her suit, Phillips' mother alleged, among other things, that the defendants "deprived her of her constitutional due process right to her daughter's body.  Specifically, [she] allege[d] a constitutional possessory right to the prompt delivery of her daughter's burial and that by not identifying her as Phillips' next of kin until after her daughter's body had been in their custody for 3 ½ weeks, Defendants violated that right." *Id.*

As noted above, the court in *Badder* undertook a detailed review of the relevant caselaw, including *Whaley*, *Dampier*, *Daxator*, *Keyes*, and *Deeg*, and it concluded that a family member's right to the return of a decedent's body "preserved in the state it was in at the time of death" had "*never* been recognized" as a "property right […] by the Michigan Supreme Court or the Sixth Circuit Court of Appeals." *Id.* (emphasis added).  Thus, the court held that "based on a review of both Sixth Circuit and Michigan jurisprudence […] no clearly-established constitutional right

was violated by [d]efendants' delay in notifying [plaintiff] of her daughter's death." *Id.* at 917.

A second Judge in this District reached the same conclusion in *Majchrzak*. That case arose out of the death of Timothy Majchrzak.  After Majchrzak died, an investigator with the ME's Office attempted to locate Majchrzak's next of kin by running "searches on a private database." *Majchrzak*, 2022 WL 20692608, at *1. Due to a spelling error with Majchrzak's last name, the "searches did not return any results." *Id.*  Several months later, the spelling error was discovered, and a new search returned the names of Majchrzak's family. *See id.*  "Members of the family recovered Majchrzak's body shortly thereafter.  According to the Majchrzaks, their brother's body was severely decomposed by the time they recovered it, and they were not able to have an open casket funeral as they desired." *Id.* at *2.  Majchrzak's family then filed a civil action against Wayne County and several employees of the ME's Office.  They alleged, among other things, that the defendants "deprived [them] of a constitutionally protected property right/interest in [the] timely release of their deceased brother's body for the purpose of burial." *Id.*

The court disagreed.  It first held that while the circumstances of Majchrzak's case were "tragic," the plaintiffs had failed to "establish[] a constitutionally protected property interest in the timely possession of a decedent's remains." *Id.* at *5.  It then held that, "[e]ven if [plaintiffs] had established a violation of a

32

constitutional property right, this right was not clearly established." *Id.* at *6.  It

explained that ruling as follows:

> The timely identification of a decedent, notification to the
> decedent's family of the decedent's death, and delivery to
> the decedent's family of a decedent's remains have not
> been authoritatively decided to be constitutionally
> protected rights by the United States Supreme Court, the
> Sixth Circuit, or the Michigan Supreme Court. [….]
> Therefore, no clearly established constitutional right was
> violated by Defendants' alleged delay in notifying the
> Majchrzaks of their brother's death and in delivering his
> body to them […]

*Id.*

Plaintiffs counter that *Badder* and *Majchrzak* do not support Defendants'

qualified immunity defense because those decisions are distinguishable on their

facts.  They insist that both cases involved delays in returning corpses that were "due

to difficulty in identifying their next of kin, despite the defendants' diligent efforts

to do so." (Pls.' Resp., ECF No. 23, PageID.193.)  They say that the circumstances

of those cases stand "in stark contrast" to the circumstances here – in which

Defendants allegedly "took no steps to even try to notify Plaintiffs of [Martinez's]

death and the location of his body for over two months after they obtained possession

of his body, identified him, identified his next-of-kin, and conducted the autopsy."

(*Id.*, PageID.193-194.)

The factual differences identified by Plaintiffs do not lessen the relevance of

*Badder* and *Majchrzak* to Defendants' qualified immunity defense.  While the facts

of those cases may have differed somewhat from those alleged here, the courts in both of those cases addressed the same *legal* question raised by Defendants' qualified immunity defense: namely, whether the family of a decedent has a clearly established constitutional right to timely notification of the decedent's death and timely return of his body. The answers to that question given by the courts in *Badder* and *Majchrzak* are instructive here.

## D

For all of the reasons explained above, the Court concludes that the individual Defendants are entitled to qualified immunity, and the Court will therefore **DISMISS** Plaintiffs' procedural due process claim alleged in Count I of the Second Amended Complaint.

## V

The Court next turns to Plaintiffs' municipal liability claim in Count II of the Second Amended Complaint. Under the governing standard first described in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality "may not be held liable under § 1983 on a *respondeat superior* theory—in other words, solely because it employs a tortfeasor." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quotation omitted; emphasis in original). Rather, "a plaintiff must show that through its deliberate conduct, the municipality was the moving force behind the injury alleged." *Id*. (quotation omitted). A plaintiff makes that showing

by alleging and presenting evidence "that the municipality had a 'policy or custom' that caused the violation of his rights." *Id.* (quoting *Monell*, 436 U.S. at 694). "There are four methods of showing the municipality had such a policy or custom: the plaintiff may prove (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id.* (quotation omitted).

Here, Plaintiffs appear to proceed primarily under two of the methods described above: (1) the existence of a policy of inadequate training or supervision and (2) the existence of a custom of tolerance or acquiescence of federal rights violations.  Plaintiffs say, "as a matter of policy," Wayne County "failed to properly investigate, discipline, supervise and/or retain" Dr. Schmidt. (*Id.* at ¶ 47, ECF No. 13, PageID.72-73.)  They also claim that Wayne County "[f]ail[ed] to supervise, train and/or discipline employees of [ME's Office], including but not limited to the individual Defendants [], as to their responsibility to notify Plaintiffs of [Martinez's] death and to deliver to Plaintiffs possession of his body." (*Id.* at ¶ 45(a), PageID.72.)

Plaintiffs' allegations fail to state a viable municipal liability claim against Wayne County.  Plaintiffs have not pleaded any *facts* that, if proven, would establish that Wayne County failed to investigate, supervise, train, and/or discipline its

35

employees or that Wayne County had "a custom of tolerance or acquiescence of federal rights violations."   For instance, the "Statement of Facts" of the Second Amended Complaint does not contain a single allegation related to a custom, policy, or practice of Wayne County.   Instead, that section focuses exclusively on the County's handling of Martinez's corpse and failure to contact Plaintiffs; that section does not mention a single other instance of alleged misconduct by a County employee or tolerance of such misconduct by the County. (*See* Sec. Am. Compl. at ¶¶ 20-34, ECF No. 13, PageID.66-69.)   And the count of the Second Amended Complaint asserting the claim against the County – Count II – likewise does not allege any specific facts concerning a County policy, practice or custom. (*See id.* at ¶¶ 44-51, PageID.71-73.)

The closest Plaintiffs come to pleading facts supporting the County's liability is in paragraph 46 of the Second Amended Complaint.   There, Plaintiffs allege: "In particular, Defendant Wayne County, acting through the [ME's Office][, was on actual notice that Defendant Schmidt, its official policymaker, had a history of failing to promptly and compassionately notify next of kin of decedents' deaths and of failing to promptly deliver decedents' bodies to their next of kin." (*Id.* at ¶ 46, PageID.72.)   But that allegation cannot save Plaintiffs' municipal liability claim because it merely parrots the legal standard that Plaintiffs must satisfy in order to prevail on their claim.   That standard requires Plaintiffs to show that Wayne County

failed to adequately address and/or tolerated a history or pattern of constitutional violations. *See, e.g., Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (noting that "[a] failure-to-train claim [] requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse" and that "a custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims") (internal punctuation and citations omitted); *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 670 (6th Cir. 2022) (explaining that to prevail on municipal liability claim arising out of "a custom of tolerance or acquiescence of federal rights violations" a plaintiff "must show a custom of similar incidents such that ratification of those incidents establishes acquiescence"). Plaintiffs' allegations simply state in conclusory fashion that that legal requirement has been satisfied.

For these reasons, the Court will **DISMISS** Plaintiffs' federal constitutional claim in Count II against Wayne County.[6]

---

[6] As Defendants note, the Court's conclusion that the constitutional rights asserted by Plaintiffs are not clearly established may also be fatal to at least some portion of Plaintiffs' constitutional claims against Wayne County. Here is why. There is authority for the proposition that in order to proceed on those claims, Plaintiffs must sufficiently allege that the County acted with deliberate indifference. *See Smith v. Wyoming*, 821 F.3d 697, 707 (6th Cir. 2016) (requiring a plaintiff suing a municipality on a failure-to-train/supervise theory to show "that the inadequacy of training or supervision was the result of the municipality's deliberate indifference"); *Jackson v. Wilkins*, 517 F. App'x 311, 321-22 (6th Cir. 2013) (explaining that a showing of deliberate indifference is required to prevail on a municipal liability claim based upon an alleged failure to discipline). There is also authority for the

## VI

With the dismissal of Counts I and II, the only remaining claims in this action

– in Counts III, IV, and V of the Second Amended Complaint – all arise under

Michigan law.  Because the Court is dismissing all of Plaintiffs' federal claims, the

Court will exercise its discretion and decline to exercise supplemental jurisdiction

over the remaining state-law claims. *See*, *e.g.*, *Musson Theatrical, Inc. v. Fed. Exp.*

*Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (explaining that "[w]hen all federal

claims are dismissed before trial, the balance of considerations usually will point to

dismissing the state law claims"); *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009)

(noting that "[i]f the federal claims are dismissed before trial, the state claims

generally should be dismissed as well").  The Court therefore **DISMISSES** those

claims **WITHOUT PREJUDICE**.

---

proposition that in order to show that a municipality acted with deliberate indifference, a plaintiff must show that the municipality failed to train, supervise, or discipline its employees with respect to a *clearly-established* constitutional right. *See Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 995 (6th Cir. 2017) (explaining that "[t]he violated right in a deliberate-indifference case [] must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear") (emphasis in original).  Under these lines of cases, the Court's holding that Plaintiffs have failed to allege the violation of a clearly established right may be fatal to Plaintiffs' municipal liability claim against the County. *See Badder*, 50 F.Supp.3d at 918-19 (dismissing similar municipal liability claim against Wayne County because Plaintiffs failed to allege the violation of a clearly established right); *Majchrzak*, 2022 WL 20692608, at *7 (same).  However, the Court need not reach that question in light of the Court's determination that Plaintiffs' municipal liability allegations are conclusory and therefore are insufficient to state a viable claim against the County.

**VII**

For all of the reasons explained above, Defendants' Motion to Dismiss (ECF

No. 19) is **GRANTED** as follows:  Counts I and II of Plaintiffs' Second Amended

Complaint are **DISMISSED WITH PREJUDICE**.  Counts III, IV, and V are

**DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman<br>
MATTHEW F. LEITMAN<br>
UNITED STATES DISTRICT JUDGE

Dated:  April 25, 2024

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 25, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan<br>
Case Manager<br>
(313) 234-5126